**FILED**

MAY 2 5 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BRIAN RUHNKE and COLLEEN RUHNKE, | ) |
| | ) |
| Plaintiffs, | ) Case No. 05 C 1395 |
| | ) |
| v. | ) Judge Marovich |
| | ) |
| PIPE FITTERS' WELFARE FUND, LOCAL 597, an | ) |
| employee benefit plan, and PHILIP A. DORAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT PIPE FITTERS' WELFARE FUND, LOCAL 597'S MOTION TO DISMISS COUNT I OF COMPLAINT

### Introduction

On March 9, 2005, Plaintiff Brian Ruhnke ("**Brian**"), a plan participant, and his wife, Colleen Ruhnke ("**Colleen**"), a plan beneficiary, filed a Complaint for civil enforcement under Section 502(a) of the Employee Retirement Income Security Act ("**ERISA**"), 29 U.S.C. § 1132, against Defendant Pipe Fitters' Welfare Fund, Local 597 (the "**Plan**"), an employee benefit plan, to compel payment of benefits under the Plan for medical expenses incurred by Colleen as a result of a car accident (Count I). Colleen also brought an action for legal malpractice and breach of fiduciary duty (Counts II and III) against Defendant Philip A. Doran ("**Doran**"), Colleen's former attorney, who entered into an unauthorized settlement agreement with the Plan in which he compromised the Plan's lien for a lesser amount, but agreed - - unbeknownst to Colleen - - that the Plan would deny Colleen future benefits for further medical treatment for injuries related to the accident until the full amount of the personal injury settlement she had received had been fully expended.

On March 31, 2005, the Plan filed a Motion To Dismiss the Complaint and supporting Memorandum ("**Memo**"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] The Plan argues that: (a) a valid and enforceable contract exists, which serves as an absolute bar to Plaintiffs' claim; (b) Doran acted within the scope of his authority as Colleen's attorney in entering into the Settlement Agreement with the Fund, or alternatively, that he possessed apparent authority to do so; and (c) the denial of Plaintiffs' claim by the Board of Trustees of the Fund was not arbitrary or capricious.

As fully set forth below, the Court should deny the Plan's Motion To Dismiss because: (a) the Plan has not satisfied its burden of proof that Colleen expressly authorized the acceptance of the Plan Settlement Offer; (b) the Plan relies on inapposite case law to support its argument that Doran had authority or apparent authority to accept the Plan Settlement; and (c) there is no provision in the Plan, SPD or Subrogation Agreement which authorized the Plan to limit future benefits available to individual plan participants or beneficiaries.

## Factual Allegations of the Complaint

On May 5, 1999, Colleen, who was then 40 years-old, was seriously injured in an automobile accident (the "**Accident**") as a result of which she suffered and continues to suffer debilitating nerve pain in her back, for which she has a spinal cord stimulator inserted in her spine. (¶ 6). Colleen has been forced to undergo multiple back and other surgeries, and expects to have additional surgeries in the future. (¶ 6). At the time of the Accident, Colleen's husband Brian was a member of the Pipe Fitters' Local 597 and was a Plan participant; Colleen was a beneficiary and covered person under the Plan. (¶ 7).

The Summary Plan Description ("**SPD**"), a copy of which is attached to the Complaint as Exhibit A, states, in pertinent part, as follows:

---

[1] Doran filed a Motion To Dismiss on April 28, 2005, to which Plaintiffs have filed a separate Response.

2

Subrogation or reimbursement rules apply if the Fund pays medical bills which arise out of an incident (accident) which may result in a claim against a third-party. Under these circumstances, the Fund is entitled to reimbursement of its expenditures.

* * *

You and/or your dependent must immediately notify the Fund Office whenever a claim against a third-party is made for yourself and/or your dependent regarding any loss for which benefits are received from the Fund. You and/or your dependent must cooperate with the Fund by providing, among other things, information requested by the Fund concerning subrogation or reimbursement. . . .

* * *

If you and/or your dependent receive payment from a third party for benefits paid by the Fund, you and or the third party must reimburse the Fund Office. The proceeds from the settlement or judgment must be divided as follows:

- First, a sum sufficient to fully reimburse the Fund Office for all (100%) benefits advanced. No reductions or deductions are allowed for attorneys' fees;[2] then

- Any remainder will be paid to you and/or your dependent.

The proceeds of the settlement must be divided as stated above even if you and/or your dependent are not fully compensated for the loss. However, the Fund is not entitled to receive reimbursement in excess of the amount you/or your dependent receive from all responsible parties.

(¶ 8). On June 24, 1999, Brian and Colleen entered into a Subrogation Agreement, a copy of which is attached to the Complaint at Exhibit B. (¶ 9).

From approximately June 1999 through August 6, 2003, Brian submitted to the Plan medical bills in the amount of $225,132.99, for services rendered to Colleen as a result of the Accident, which the Plan paid. (¶ 10). In July 1999, Colleen hired Doran to represent her in a personal injury action against the driver who caused the Accident and Doran subsequently filed a personal injury lawsuit on behalf of Colleen against Jeanne Habenicht in the Law Division of the Circuit Court of

---

[2] Notwithstanding the Plan provision that does not allow for a reduction in benefits advanced to account for attorneys fees incurred in obtaining the third party payment, Colleen filed her personal injury lawsuit against the driver who caused the Accident in Illinois state court, as discussed below, and the Plan's reimbursement would therefore have been reduced proportionally to account for the reasonable value of Doran's fees in obtaining the Personal Injury Settlement, pursuant to the Illinois Supreme Court's ruling in *Scholtens v. Schneider*, 173 Ill.2d 375, 671 N.E.2d 657 (1996).

Cook County, Case Number 00 L 12596. (¶ 11). Pursuant to his representation of Colleen, Doran was in possession of Colleen's medical records and knew or should have known about the serious nature of her injuries from the Accident, her multiple surgeries and her need for ongoing, costly medical treatment, including future surgeries. (¶ 12). On June 2003, Doran settled the personal injury against Habenicht for $1,100,000 (the "**Personal Injury Settlement**"), pursuant to Colleen's authorization. (¶ 13).

On August 5, 2003, Doran engaged in a telephone conference with Dennis R. Johnson ("**Johnson**"), General Counsel to the Plan, in which the two men discussed a settlement of the Plan's right to reimbursement and subrogation. (¶ 14). The next day, Johnson sent Doran a letter (the "**August 6 Letter**"), attached as Exhibit D to the Complaint, in which Johnson made the following settlement offer (the "**Plan Settlement Offer**"): (a) the Plan would "accept $157,593.09 in full and final satisfaction of its rights to reimbursement and subrogation in the amount of $225,132.99" and (b) "future medical bills not already paid by" the Plan which are related to the Accident "will be [Colleen's] responsibility, unless and until she incurs related medical expenses which exceed the proceeds from the litigation." (¶ 14). The August 6 Letter stated that the Plan Settlement Offer would remain valid provided payment was received within 120 days. (¶ 14).

Upon receipt of the August 6 Letter, Doran did not provide Colleen with a copy of it or otherwise discuss the Plan Settlement Offer with her, but rather, shortly after receiving the August 6 Letter and without Colleen's knowledge, consent or authorization, Doran accepted the Plan Settlement Offer by sending the Plan a check for the stated amount of $157,593.09. (¶ 15). Colleen never signed an agreement or otherwise authorized Doran to accept the Plan Settlement Offer on her behalf. (¶ 15). Although Doran provided Colleen with a Settlement Breakdown Sheet which indicated that the Plan's Lien of $225,132.99 had been "compromised for" $157,593.09, Doran did not advise Colleen that as part of this so-called "compromise," he had agreed that the Plan would

4

deny Colleen future benefits for further medical treatment for injuries related to the Accident until the Personal Injury Settlement had been fully expended. (¶ 16).

It was not until the end of August 2003 that Colleen and Brian first learned that Doran had, without authority, accepted the Plan Settlement Offer on Colleen's behalf. (¶ 17). Their knowledge arose when Brian submitted to the Plan after August 6, 2003, additional medical bills related to the Accident and the Plan mailed back a notice indicating that payment of Colleen's medical bills was "Denied Per Subrogation Agreement." (¶ 17). Upon receipt of this notice, Colleen contacted Beverly Gratowski ("**Gratowski**"), an officer of the Plan, to inquire about the non-payment of her medical bills. (¶ 17). Gratowski informed Colleen that she should talk to Doran, who had accepted the Plan Settlement Offer on her behalf, pursuant to which Colleen would be responsible for paying her own medical bills related to the Accident until such time as Colleen incurs related medical expenses which exceed the proceeds of the Personal Injury Settlement. (¶ 17).

When Colleen called Doran to discuss his unauthorized acceptance of the Plan Settlement Offer, Doran first denied any recollection of doing so, but ultimately sent Colleen a copy of the August 6 Letter in or about the end of October 2003. (¶ 18). Colleen continued to incur medical bills in the approximate amount of $19,384.89, which Brian submitted to the Plan and which the Plan rejected based on the purported acceptance of the Plan Settlement Offer. (¶ 19). Colleen and Brian subsequently retained counsel, Alvin R. Becker ("**Becker**"), to appeal the Plan's denial of reimbursement for her medical treatment related to the accident. (¶ 20). On or about August 13, 2004, Becker sent a letter to the Board of Trustees for the Plan, a copy of which is attached as Exhibit E to the Complaint, requesting that the Trustees overrule the denial of Plan benefits to Colleen on the basis that: (a) there is no Plan provision, no Plan summary description, and no Subrogation Agreement provision which authorizes the Plan to recover any more or limit future

benefits available to members; and (b) the Plan Settlement Offer accepted by Doran had not been authorized by Colleen. (¶ 20).

On or about November 18, 2004, the Plan's Claim Manager, Liz Eastman, wrote Becker a letter, a copy of which is attached as Exhibit F to the Complaint, in which she stated, *inter alia*, that the Plan was denying the Ruhnke's appeal, in light of Doran's acceptance of the Plan Settlement Offer. (¶ 21). In late 2003 and throughout 2004, Plaintiffs received numerous telephone calls and letters from doctors and hospitals to whom they owed money for Colleen's medical bills related to the accident. (¶ 22). Because Colleen continues to require ongoing treatment from these providers, Plaintiffs, in or about December 2004, paid outstanding medical bills in the approximate amount of $12,800, which the Plan had previously rejected, although a number of Colleen's outstanding medical bills remain due and owing. (¶ 22).

### Argument

**A.   The Plan's Motion To Dismiss Count I  Should Be Denied Because The Plan Has Not Satisfied Its Burden Of Proof That Colleen Expressly Authorized The Acceptance Of The Plan Settlement Offer.**

In Count I of the Complaint, Plaintiffs seek: (a) the entry of an Order pursuant to 29 U.S.C. § 1132(a)(1)(B) to enforce their rights under the Plan by compelling the Plan to pay any and all outstanding medical bills related to Colleen's Accident; (b) the entry of an Order pursuant to 29 U.S.C. § 1132(a)(3), declaring that the Plan must pay all future medical bills related to the Accident which are incurred by Colleen as long as Brian remains a Plan participant; and (c) Plaintiffs' attorneys fees and costs incurred in bringing this action, pursuant to 29 U.S.C. § 1132(g). The Plan seeks to dismiss Count I on the basis that the Plan Settlement Offer is a "valid and enforceable contract" which "serves as an absolute bar to Plaintiffs' claim," (Memo at 5), and that Doran acted

6

within the scope of his actual or apparent authority in accepting the Plan Settlement Offer on behalf of Colleen.[3] (Memo at 6-9). The Plan's arguments are fatally flawed as a matter of fact and law.

1. **Colleen Did Not Expressly Authorize The Acceptance Of The Plan Settlement Offer.**

A "settlement agreement is binding so long as there is clearly an offer to compromise and an acceptance, and there is a meeting of the minds as to the terms of the agreement." *Kazale v. Flowers*, 185 Ill. App. 3d 224, 227, 541 N.E.2d 219, 221 (2d Dist. 1989). Significantly, the *Kazale* Court observed that an "attorney may bind a client to a settlement agreement" but the "attorney must have express consent or authorization to conclude a settlement." *Id.* In *Kazale*, an attorney representing a plaintiff in a personal injury case agreed during a phone conference with the defendant's attorney to settle the case but the plaintiff refused to sign the release, claiming that her attorney did not have authority to conclude the settlement. *Id.* at 226, 541 N.E.2d at 220. Refusing to enforce the settlement agreement, the appellate court observed that an attorney authorized to represent a client in litigation "does not necessarily have authority to conclude a settlement." *Id.* at 227, 541 N.E.2d at 221. The *Kazale* court went on to note that there "is no case law which holds that an attorney's authority to settle is presumed in settlements outside of court," but there is "case law which holds to the contrary," citing the Illinois Supreme Court's ruling in *Danziger v. Pittsfield Show Co.*, 204 Ill. 145, 149, 68 N.E. 534 (1903):

> The authority of an attorney to prosecute a suit does not involve authority to compromise it. Before an attorney can compromise a suit, he must have a special authority for that purpose. Where an attorney, employed to prosecute or defend a suit, makes an agreement for the settlement of the same out of court, and without making the agreement a part of the decree or judgment in the suit, the client will not be bound by such an agreement, or settlement, without proof of authority in the attorney to bind the client, or acquiescence on the part of

---

[3] The Plan appears to argue that non-ERISA law is outcome determinative - - to wit, Doran's purported acceptance of the Plan Settlement Offer on behalf of Colleen - - and has cited Illinois case law in its Memo in support of its position. Plaintiffs do not dispute that Illinois law governs issues regarding the enforcement of settlement agreements, and have accordingly cited the same herein. *Dehmer v. Pruitt*, 2004 WL 1798367 at * 2 (N.D.Ill. Aug. 9, 2004) (Mahoney, Mag. J.).

the client after knowledge of the facts; and, in such case, there is no presumption of authority, but the burden of proof rests on the party, alleging authority, to show that fact.

*Id.* at 228, 541 N.E.2d at 222.

Stating that *Danziger* is still good law, the *Kazale* court observed that "where the attorneys agreed to settle outside of court and outside the presence of the parties, the agreement alone provides no evidence that plaintiff authorized or even had knowledge of a settlement." *Id.* at 229, 541 N.E.2d at 222. Holding that the defendant "had the burden of proof to show authority and offered no proof to carry that burden," the appellate court concluded that the settlement agreement was unenforceable. *Id.* at 230, 541 N.E.2d at 223.

Citing *Kazale* and *Danziger*, the Illinois Supreme Court noted in *Brewer v. National Railroad Passenger Corp.*, 165 Ill.2d 100, 105, 649 N.E.2d 1331, 1333-34 (1995), that the "controlling legal principles are quite settled" in that an "attorney who represents a client in litigation has no authority to compromise, consent to a judgment against the client, or give up or waive any right of the client" without the "client's express authorization to do so." *Brewer* involved the enforcement of a settlement agreement reached in a personal injury action brought by an employee-plaintiff against his employer in which the plaintiff's attorney agreed, in the judge's chambers outside the plaintiff's presence, that as one of the settlement terms, the plaintiff would quit his job with the employer. *Id.* at 102, 649 N.E.2d at 1332. Relying on the plaintiff's testimony that he never agreed to quit his job; never authorized his attorney to make such an agreement; and was never informed that his resignation was a settlement term, the *Brewer* Court reversed the trial and appellate courts' decision to enforce the settlement agreement. *Id.* at 103, 107, 649 N.E.2d at 1333-34. *See also Blutcher v. EHS Trinity Hospital*, 321 Ill. App. 3d 131, 137, 746 N.E.2d 863, 869 (1st Dist. 2001) (refusing to enforce a settlement agreement in a medical malpractice action where plaintiff-patient did not authorize his attorney to enter into the settlement, noting that the "attorney must receive the client's express authorization" to compromise or settle a lawsuit).

*Kazale, Danziger, Brewer,* and *Blutcher* are directly on point. Here, as in those cases, the Complaint alleges that Plan Settlement Offer was accepted by Colleen's attorney, Doran, out of court; Colleen was never advised that under the terms of the Plan Settlement Offer, the Plan would deny her future benefits for further medical treatment for injuries related to the accident until all of the proceeds of the Personal Injury Settlement were expended; and Colleen's signature does not appear on any documentation regarding the Plan Settlement Offer. (¶¶ 14-15). All of these well-pleaded factual allegations must be taken as true for purposes of a motion to dismiss pursuant to Rule 12(b)(6). *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991). Although it is the Plan's burden of proof to show that Colleen gave Doran authority to accept the Plan Settlement Offer, the Plan has utterly failed to sustain this burden in its Motion to Dismiss. Accordingly, the Plan's Motion to Dismiss Count I should be denied.

## 2. The Plan Relies On Inapposite Cases To Support Its Meritless Argument That Doran Acted Within The Scope Of His Authority Or Apparent Authority In Accepting The Plan Settlement Offer.

In support of its meritless argument that Doran acted within the scope of his authority as Colleen's attorney in accepting the Plan Settlement Offer, the Plan relies on a host of inapposite cases, none of which involve the attorney's acceptance of a settlement agreement without authority.

First, the Plan cites *Horowitz v. Holabird & Root*, 212 Ill.2d 1, 816 N.E.2d 272 (2004), for the premise that courts have "generally held that a client is bound by the acts or omissions of their attorney acting within the scope of the attorney's representation of the client." (Memo at 6). *Horowitz*, however, is not remotely similar to the instant case. Rather, *Horowitz* involved a lawsuit for tortious interference with business relationships, brought against the clients of an attorney as the principal acting through its counsel. *Id.* at 5, 816 N.E.2d at 274. In a case of first impression as to whether clients may be held liable for their attorneys' alleged intentional torts against a third party taken without the direction or knowledge of the client, the Illinois Supreme Court held that the

9

clients may not be held liable. *Id.* at 9, 12, 816 N.E.2d at 277-78. The *Horowitz* Court stated that where "an attorney acts pursuant to the exercise of independent professional judgment, he or she acts presumptively as an independent contractor whose intentional misconduct may generally not be imputed to the client, subject to factual exceptions." *Id.* at 12, 816 N.E.2d at 278.

In addition to the irrelevant *Horowitz* case, the Plan cites *People v. Bowman*, 138 Ill.2d 131, 561 N.E.2d 633 (1990), in support of the unremarkable proposition that an "attorney is the agent of the client" (Memo at 6) and cites *Pioneer Investment Services Company v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489 (1993), for the principle that a "party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." (Memo at 7). Again, neither of these cases involved an attorney's acceptance of a settlement agreement without the express consent of his client. In *Bowman*, a defendant in a criminal matter claimed that he did not ask for or expressly acquiesce to a continuance, yet his defense counsel moved to remove the case from the trial calendar and continue the matter. *Id.* at 135-36, 561 N.E.2d at 635-36. In holding that the attorney's action was attributed to the defendant and tolled the speedy trial period, the *Bowman* Court observed that "[i]n criminal proceedings, an attorney is authorized to act for his client and determine for him procedural matters and decisions involving trial strategy and tactics." *Id.* at 141, 561 N.E.2d at 638. In *Pioneer*, the issue was whether creditors of a Chapter 11 debtor would be permitted an extension of the bar date for filing their proofs of claim, due to the excusable neglect of their attorney. 507 U.S. at 397, 113 S.Ct. at 1499. Although the *Pioneer* Court found the fault of the creditor's counsel was attributable to the creditors, it found that counsel's neglect was excusable under the facts in the case. *Id.* at 397-98, 113 S.Ct at 1499-1500.

In contrast to *Bowman* and *Pioneer*, which involved the filing of motions and pleadings by counsel on behalf of their clients, the case at bar involves the unauthorized acceptance of a

10

settlement agreement by an attorney on behalf of his client - - a significant difference under Illinois case law, because it requires the client's express authorization, as addressed *supra* at pp. 7-9. For this reason, the Plan's reliance on *Link v. Wabash Railroad Co.*, 370 U.S. 626, 82 S.Ct. 1386 (1962), is misplaced. (Memo at 7). In *Link*, the U.S. Supreme Court affirmed the dismissal of a personal injury case for failure to prosecute after plaintiff's counsel failed to appear at a duly scheduled pretrial conference, concluding that counsel's excuse did not adequately explain his failure to attend, and given the history of the litigation from which the court determined that the plaintiff had been deliberately proceeding in dilatory fashion. *Id.* at 633, 636, 82 S.Ct. at 1390-92. Likewise, *United States v. 7108 West Grand Ave, Chicago, Illinois*, 15 F.3d 632 (7th Cir. 1994) (Memo at 7), is of little moment, as that case involved the Seventh Circuit's upholding a forfeiture judgment entered against the clients of an attorney who had failed to timely file claims on their behalf with regard to parcels of real property which the government claimed were purchased with proceeds from the clients' drug business.

Tellingly, the Plan has not cited a single case in its Memo wherein a court enforced a settlement agreement accepted by an attorney without his or her client's express authorization. Because Illinois law treats this scenario differently from that in which a client is bound by the negligence of his attorney in failing to timely file pleadings or appear at hearings, the cases on which the Plan relies are inapposite and the Plan's Motion To Dismiss should be denied.

The Plan fares no better with its argument that Doran possessed "apparent authority" to accept the Plan Settlement Offer on behalf of Colleen. Given that Illinois law requires an attorney to obtain express authorization from the client before accepting a settlement agreement, the concept of "apparent authority" does not apply in this context and the Plan has not cited any case law which says otherwise. Indeed, *Gilbert v. Sycamore Municipal Hospital*, 156 Ill.2d 511, 622 N.E.2d 788 (1993) and *O'Banner v. McDonald's Corp.*, 173 Ill.2d 208, 670 N.E.2d 632 (1996), on which the

11

Plan relies (Memo at 8), are both distinguishable as neither involves an attorney-client relationship at all, let alone the unauthorized acceptance of a settlement agreement by an attorney on behalf of his client.

In *O'Banner*, the Illinois Supreme Court held that a customer who was injured in a slip and fall in the restroom of a McDonald's franchise could not recover under an "apparent agency" theory against the franchisor McDonald's Corporation, unless the customer could "show that he actually did rely on the apparent agency in going to the restaurant where he was allegedly injured." 173 Ill.2d at 213-14, 670 N.E.2d at 634-35. And in *Gilbert*, the Illinois Supreme Court held that a hospital can be held vicariously liable for the negligent acts of a doctor providing care at the hospital, regardless of whether the doctor is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor. 156 Ill.2d at 524, 622 N.E.2d at 795. Although *Gilbert*, which was decided on a motion for summary judgment, is factually inapposite, it is noteworthy that the Court observed that "[w]hether an agent is authorized to act is a question of fact" and that "[w]hether a person has notice of the lack of an agent's authority, or is put on notice by circumstances, is likewise a question of fact." *Id*. Thus, even if the "apparent authority" argument were applicable here - - which Plaintiffs dispute - - the issue of Doran's "apparent authority" to accept the Plan Settlement Offer on Colleen's behalf is a question of fact, which is inappropriate on a Motion To Dismiss pursuant to Rule 12(b)(6).

Finally, the Plan cites *Bradford v. Denny's Inc.*, 1998 WL 312009 (N.D.Ill. June 4, 1998) (Anderson, J.) in support of its "apparent authority" argument, claiming that the facts are "similar to the case at hand." (Memo at 8). Nothing could be further from the truth. The plaintiff in *Bradford*, which was decided on a summary judgment motion, sought to enforce a favorable arbitration award against Denny's, rather than an "unfavorable settlement agreement" as the Plan incorrectly states in its Memo. (Memo at 8). *Id*. at * 1-2. Denny's participated in the arbitration and did not dispute the

$300,000 arbitration award to Bradford, but rather, Denny's claimed after the arbitration that it never agreed to binding arbitration and that its counsel exceeded its authority by entering into and executing the arbitration agreement. *Id.* at * 2. Rejecting Denny's argument, the District Court enforced the arbitration award and found that the undisputed facts established that Denny's ratified the acts of its counsel, as a matter of law, having admitted "that it knew about the binding nature of the arbitration the day before the arbitration" but yet, it never filed a motion to stay the arbitration and never raised any objection at or before the arbitration regarding the validity of the arbitration agreement. *Id.* at * 1, 5. Here, unlike Denny's, Colleen had no knowledge that Doran had entered into the Plan Settlement Agreement and once she learned of it, far from ratifying Doran's conduct, she retained counsel to appeal the Plan's denial of reimbursement for her medical treatment related to the accident. (¶¶ 15, 17, 20).

As there is no support for the Plan's argument that Doran acted within the scope of his authority or apparent authority in accepting the Plan Settlement Offer, the Plan's Motion To Dismiss pursuant to Rule 12(b)(6) should be denied.

**B.** **The Plan's Motion To Dismiss Should Be Denied Because There Is No Provision In The Plan, SPD or Subrogation Agreement Which Authorized The Plan To Limit Future Benefits Available To Individual Plan Participants Or Beneficiaries.**

Finally, the Plan argues that even if Doran's acceptance of the Plan Settlement Offer is not valid and enforceable, the Complaint should be dismissed because the Plan Administrator properly exercised its discretion interpreting the provisions of the Plan to determine "that the terms of the Offer made to Colleen was consistent with the terms of the Plan." (Memo at 12). This argument is a red herring which should be summarily rejected as there is no provision in the Plan, SPD or Subrogation Agreement which authorized the Plan to limit future benefits available to individual plan participants or beneficiaries - - and the Plan has pointed to none in its Memo.

13

"ERISA's framework ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896, 902 (3d Cir. 1995). Thus, the "written terms of the plan documents control." *Id.*

Here, the Plan sets forth in its Memo the "relevant section of the 1998 Plan" (Memo at 10) and then broadly argues that the Fund's "Board of Trustees interpreted these provisions in its denial of the Plaintiff's appeal," which denial stated generally that the "offer of settlement is in writing and is consistent with the Plan provisions on Subrogation or Reimbursement." (Memo at 10-12). Tellingly, neither the Board of Trustees' Appeal denial nor the Memo specifies the Plan provision which the Board of Trustees purportedly "interpreted" - - because there is no such provision. Thus, this case is distinguishable from the cases cited in the Memo, such as *Firestone Tire and Rubber Co. v. Bruch* (Memo at 9), in which the plan administrator interpreted an existing plan provision. *Id.* at 489 U.S. 101, 105-106, 109 S.Ct. 948, 951-52 (1989) (interpreting what constituted a "reduction in work force" as used in the plan); *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001) (Memo at 10) (interpreting "regular monthly pay" and "extra compensation" as used in the plan). Since there is no language in the Plan, SPD or Subrogation Agreement which authorized the Plan to limit future benefits available to individual plan participants or beneficiaries, there is nothing to "interpret" in an "arbitrary and capricious manner" or otherwise.

Moreover, the law is well settled that an ERISA prohibits informal written amendments to welfare benefit plans. *Smith v. National Credit Union Admin. Board*, 36 F.3d 1077, 1080 (11th Cir. 1994) ("ERISA prohibits not only oral modifications, but informal written amendments of employee benefit plans as well"); *Mohalley v. Kendall Health Care Products Co., Inc.*, 903 F. Supp.

14

1530, 1536 (M.D.Ga. 1995) ("Any modification or amendment to an existing ERISA plan may not be adopted or applied . . . unless the amendment is in a formal, complete and written form."). By limiting Colleen's right to receive payment for future medical bills related to the Accident up to the amount of the Personal Injury Settlement where there is no provision in the Plan allowing for this, the Plan has, in essence, amended the Plan informally, which is not permitted under ERISA. As the written terms of the Plan control, and there is nothing in the Plan which permits the Plan to limit Colleen's future benefits relating to the Accident, the Plan's motion to dismiss on this ground should be rejected.

### Conclusion

For all of the foregoing reasons, Plaintiffs Brian Ruhnke and Colleen Ruhnke respectfully request that the Court deny the Defendant Pipe Fitters Welfare Fund, Local 597's Motion To Dismiss Count I, brought pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

BRIAN RUHNKE and COLLEEN RUHNKE

By: _____
One of their Attorneys

Alvin R. Becker, Atty. No. 147966
Deane B. Brown, Atty. No. 6203878
Beermann, Swerdlove, Woloshin,
 Barezky, Becker, Genin & London
161 N. Clark Street, Suite 2600
Chicago, Illinois 60601
(312) 621-9700

15